*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES
_____

**UNITED STATES**
Appellant

**v.**

**Danielle E. Deremer, Private First Class**
United States Marine Corps, Appellee

**No. 25-0158**
Crim. App. No. 202300205

Argued January 28, 2026—July 23, 2026

Military Judge: Benjamin A. Robles

For Appellant: *Major Mary Claire Finnen*, USMC (argued); *Lieutenant K. Matthew Parker*, JAGC, USN, *Brian K. Keller*, Esq. (on brief); *Lieutenant Colonel Candace G. White*, USMC.

For Appellee: *Lieutenant Raymond E. Bilter*, JAGC, USN (argued).

Amici Curiae for Appellee: *Captain Daniel Cimmino*, JAGC, USN, *Lieutenant Sterling Gutierrez*, JAGC, USN, and *Lieutenant Girija Hathaway*, JAGC, USN (on behalf of the U.S. Navy Victims' Legal Counsel Program), *Colonel Joseph I. Grimm*, USMC (on behalf of the U.S. Marine Corps Victims' Legal Counsel Organization)*, Colonel Andres Vazquez Jr.* (on behalf of the U.S. Army Special Victims' Counsel Program), and *Elizabeth G. Marotta*, Esq. (on behalf of the U.S. Coast Guard Special Victims' Counsel Program) (on brief).

Amicus Curiae: *Sean J. Kealy*, Esq., Boston University School of Law (in support of neither party) (on brief).

Judge JOHNSON delivered the opinion of the Court, in which Chief Judge OHLSON and Judge HARDY joined. Judge SPARKS filed a separate opinion concurring in the judgment, in which Judge MAGGS joined.

––––––––––––––

Judge JOHNSON delivered the opinion of the Court.

This certified case raises issues that require the Court to interpret the nature and scope of the rights set forth in 10 U.S.C. § 1044e, Special Victims' Counsel for victims of sex-related offenses (SVC).[1]

Appellee,[2] a recruit attending Marine Corps boot camp at Parris Island, South Carolina, reported that she was sexually abused and harassed by a female recruit in her training platoon. Naval Criminal Investigative Service (NCIS) agents conducted an initial interview with Appellee in the presence of her VLC. They also questioned several members of Appellee's training platoon. As a result of these interviews, the agents began to suspect Appellee's report was untruthful. NCIS agents interviewed Appellee a second time, without notifying her VLC. During this second interview, Appellee affirmatively waived her Article 31(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 831(b) (2018), rights and made incriminating statements.

A special court-martial convicted Appellee, contrary to her pleas, of one charge and specification of malingering (Charge I), and one charge and specification of making a false official statement (Charge II), in violation of Articles 83 and 107, UCMJ, 10 U.S.C. §§ 883, 907 (2018). The military judge sentenced Appellee to a bad-conduct

---

[1] Although the statute refers to SVC, the Navy and Marine Corps refer to SVC as Victims' Legal Counsel (VLC). *See* Dep't of the Navy, Marine Corps Administrative Message 583/13, Establishment of the Marine Corps Victims' Legal Counsel Organization (VLCO) (Oct. 13, 2013); Dep't of the Navy, Navy Administrative Message 087/14, Establishment of Navy Victims' Legal Counsel (VLC) Program (Apr. 14, 2014). This opinion uses Navy and Marine Corps terminology and the statutory term interchangeably.

[2] Private First Class (PFC) Deremer was the appellant at the lower court and she is referred to as "Appellant" in the questions certified to this Court. Since the case was certified to this Court by the Judge Advocate General of the Navy on behalf of the Government as the Appellant, we refer to PFC Deremer as Appellee.

discharge and a reduction to the grade of E-1. The United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed the finding of guilty as to Charge I and its specification, but set aside the finding of guilty and the sentence as to Charge II and its specification. *United States v. Deremer*, 85 M.J. 546, 555 (N-M. Ct. Crim. App. 2025) (en banc).

The Judge Advocate General of the Navy (TJAG) certified four issues for review in this Court:

> I. Did the lower court err holding [Appellee], at an interview where she waived her right to counsel, was entitled to 10 U.S.C. § 1044e rights when she was interviewed as a suspect?

> II. Did the lower court err finding the interview violated [Appellee's] due process rights, and finding the statement involuntary under Mil. R. Evid. 304?

> III. Did the lower court err holding that suppression is an appropriate remedy for a violation of 10 U.S.C. § 1044e?

> IV. Did the lower court err by affirming [Appellee's] conviction for malingering despite holding her confession to NCIS should have been suppressed?

*United States v. Deremer*, 86 M.J. 116 (C.A.A.F. 2025) (docketing notice of certificate for review).

For the reasons stated below, we answer the first certified issue in the negative and hold that Appellee was entitled under 10 U.S.C. § 1044e to VLC when she was interviewed by NCIS as a suspect for making false sexual abuse and sexual harassment allegations. We answer the second and third certified issues in the affirmative and hold that 10 U.S.C. § 1044e, in its current form, creates neither a due process right to VLC nor a suppression remedy for violations of the statute. Accordingly, we set aside the decision of the CCA. In light of our resolution of the second and third certified issues, we need not reach the fourth certified issue.

### I. Background

Appellee enlisted in the United States Marine Corps and reported to boot camp at Parris Island, South Carolina, in June 2021. While at boot camp, Appellee reported to NCIS that she was sexually abused and harassed by PFC Hotel,[3] a female recruit in her training platoon. Appellee was seated in a wheelchair when she was interviewed by NCIS. During the interview, in the presence of her VLC, Appellee described multiple instances where PFC Hotel touched her inappropriately without consent, including once in a shower area and also in an open bunk room. Appellee also described several instances where PFC Hotel harassed her using sexually explicit remarks. Following the NCIS interview, the lead agent, Special Agent (SA) MP, told Appellee, "I may reach out to you again, it's not likely. But what I'll do is I'll go through your VLC . . . . And he'll reach out to you."

After interviewing Appellee, SA MP began interviewing witnesses. One witness corroborated Appellee's allegations, stating she saw PFC Hotel force Appellee to touch her naked buttocks in the shower of the squad bay and heard PFC Hotel make sexually suggestive comments. However, six members of the training platoon told SA MP they did not witness any of the alleged behavior, and two of them said they did not believe Appellee was telling the truth because she had a reputation for untruthfulness. When SA MP interviewed PFC Hotel, she waived her rights and denied the allegations. As a result, SA MP conducted a follow-up interview with the sole corroborating witness who now changed her story, noting that she could not see what occurred in the showers because she was not wearing her glasses.

SA MP concluded that Appellee's original report was untruthful. He closed the initial investigation and opened a perjury investigation into Appellee. He later explained it

---

[3] We utilize the same pseudonym for this individual as employed by the CCA.

was "NCIS policy that if the case agent develops probable cause that the victim lied, then we are to close [the sexual assault] investigation and open a perjury case against the previous victim as a subject, in which case she is no longer treated as a victim."

In February 2022, SA MP interviewed Appellee a second time. Appellee's VLC was not informed of the interview and was not present for it. After obtaining Appellee's biographical information, SA MP informed her that "the consensus among the girls in the squad bay" was that Appellee was "being dishonest" in her allegations of sexual misconduct and her need for a wheelchair. SA MP offered Appellee "an opportunity" to "tell . . . the truth about the initial statement that you made . . . . [b]ecause right now you're looking at lying to a federal agent, which is a big deal." SA MP then advised Appellee of her rights in accordance with Article 31(b), UCMJ, and Military Rule of Evidence (M.R.E.) 305.

While going over the Article 31(b), UCMJ, rights form, SA MP asked Appellee to initial each provision as she agreed to it, assuring her, "You're not signing any rights away. That's just me being able to say, hey, she understood that this is what's going on." Appellee initialed and verbally indicated her understanding of each provision. At SA MP's direction, Appellee read aloud the final provision stating her understanding of her rights and her intent to waive them. At SA MP's direction, she then signed the rights waiver form. Appellee subsequently made incriminating statements.

One week later, trial counsel notified Appellee's VLC that NCIS had interviewed his client without his knowledge. The VLC promptly emailed NCIS asking why his client was interviewed outside of his presence. The agent replied that Appellee "was interviewed as a subject under a [case control number] different from the case wherein [the VLC was] assigned. As such, [Appellee] had no right to have a VLC present[,] as a VLC is only offered to certain victims of crime."

At trial, the defense moved to suppress Appellee's statements to NCIS in the second interview as involuntary. Among the defense theories was a claim that Appellee was denied her right under 10 U.S.C. § 1044e and its implementing regulations[4] (hereinafter the statutory rights to VLC) to consult with VLC about allegations of collateral misconduct and to have VLC present during an interrogation about her report of a sex-related offense. The defense argued that Appellee's lack of her VLC contributed to her confusion and undermined the voluntariness of her waiver of rights and subsequent statements. The military judge denied the motion from the bench, finding that the interview, including the rights advisement, was not coercive in any way and Appellee's will was not overborne. The military judge did not address whether Appellee's waiver of her Article 31(b) rights was knowing and intelligent and did not address the impact of the VLC's absence on the waiver analysis.

On appeal to the CCA, Appellee challenged the military judge's denial of the motion to suppress, arguing that Appellee's waiver was not voluntary, her statements were involuntary, and her statements were obtained in violation of her statutory right to VLC. Among other things, Appellee argued that NCIS "tricked" her into waiving her rights by misrepresenting the consequences of signing a waiver form and excluding VLC from the second interview after assuring Appellee, at the conclusion of the first interview, that any further communications would be coordinated through VLC.

---

[4] Section 1044e has been implemented department-wide by Department of Defense Instruction 5505.18, and service-wide by Marine Corps Order 5800.16-V4. Dep't of Defense, Instr. 5505.18, Investigation of Adult Sexual Assault in the Department of Defense (Mar. 22, 2017) [hereinafter DoDI 5505.18]; Dep't of the Navy, Marine Corps Order 5800-16-V4, Marine Corps Victims' Legal Counsel Organization (Aug. 26, 2021) [hereinafter MCO 5800.16-V4]. Throughout this opinion any reference to "statutory rights" includes both § 1044e and its implementing regulations.

A majority of the en banc court held that 10 U.S.C. § 1044e entitled Appellee to VLC representation at every proceeding relating to her allegations, including the second NCIS interview; that NCIS knowingly violated that right; and that any waiver of Appellee's Article 31(b) rights did not waive the § 1044e right to VLC. *Deremer*, 85 M.J. at 552, 554. Although the statute does not specify a remedy, the court found congressional intent to be clear:

> [O]nce an individual, subject to the Code, knows, or reasonably should know, that an alleged victim is represented by an attorney pursuant to Section 1044e, questioning of that alleged victim, about related matters, without affording the counsel reasonable opportunity to be present is a due process violation, and renders any statement obtained involuntary under Mil. R. Evid. 304.

*Id.* at 554. Accordingly, the CCA held the military judge abused his discretion by not suppressing Appellee's statements to NCIS in the second interview. *Id.*

Following the CCA's ruling, TJAG certified four issues to this Court, seeking to clarify the scope of 10 U.S.C. § 1044e. *Deremer*, 86 M.J. at 116. We address each issue in turn.

## II. Standard of review

Questions of statutory interpretation are matters of law this Court reviews de novo. *United States v. Strong*, 85 M.J. 58, 63 (C.A.A.F. 2024) (citing *United States v. Mays*, 83 M.J. 277, 279 (C.A.A.F. 2023)).

## III. Discussion

Congress enacted 10 U.S.C. § 1044e to provide legal assistance to certain victims of alleged sex-related offenses. 10 U.S.C. § 1044e(a). Qualifying victims include servicemembers and their dependents. § 1044e(a)(2). Under the statute, a qualifying victim is entitled to a designated SVC or VLC upon making a restricted or unrestricted report of a sex-related offense or seeking "assistance from a Sexual Assault Response Coordinator, a Sexual Assault Victim Advocate, a military criminal

8

investigator, a victim/witness liaison, a trial counsel, a healthcare provider, or any other personnel designated" by the service Secretary for purposes of this statute. § 1044e(f)(1), (3). "Sex-related offense" is defined as any allegation of a violation of Article 120, UCMJ, 10 U.S.C. § 920, Article 120b, UCMJ, 10 U.S.C. § 920b, Article 120c, UCMJ, 10 U.S.C. § 920c, or Article 130, UCMJ, 10 U.S.C. § 930, or an attempt to commit any such offense. § 1044e(h)(1), (2).

The statute states that a victim must be notified of the availability of VLC representation "before any military criminal investigator or trial counsel interviews, or requests any statement from, the individual regarding the alleged sex-related offense." § 1044e(f)(2). Implementing regulations require notice to VLC before communicating with a represented victim. DoDI 5505.18 para. 3.1.b.(2); MCO 5800.16-V4 § 010604. Among other things, the victim is entitled to "[l]egal consultation regarding potential criminal liability of the victim stemming from or in relation to the circumstances surrounding the alleged sex-related offense and the victim's right to seek military defense services." § 1044e(b)(1). Additionally, VLC are authorized to serve as legal consultants, assistants, and representatives at "any proceedings in connection with the reporting, military investigation, and military prosecution of the alleged sex-related offense." § 1044e(b)(6).

This Court uses well-established principles of statutory interpretation when determining the scope of rights afforded by a provision of the federal code. *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007). "The Supreme Court has 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). Thus, statutory interpretation begins with consideration of the statute's plain language unless the plain meaning is ambiguous. *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012). Plain language will control unless use of the plain

language would lead to an absurd result. *United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013). As this Court noted in *United States v. Adcock*, we must "give meaning to each word" of the statute. 65 M.J. 18, 24 (C.A.A.F. 2007) (internal quotation marks omitted) (citation omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (1st ed. 2012) (noting that the surplusage canon provides that "every word and every provision is to be given effect. . . . [n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence"). Only when the statute remains unclear after consideration of each word's ordinary meaning should a court look to legislative history. *United States v. Falk*, 50 M.J. 385, 390 (C.A.A.F. 1999).

## A. Appellee had a right to VLC during the second interview

Under a plain reading of § 1044e, Appellee was entitled to the VLC during the second NCIS interview. The statute creates an attorney-client relationship between a qualifying victim of alleged sexual misconduct and a VLC. § 1044e(c). Congress broadly defined the scope of this attorney-client relationship to encompass consultation, assistance, and representation in various settings, including "represent[ation] [of] the victim at *any proceedings in connection with the reporting, military investigation, and military prosecution of the alleged sex-related offense.*" § 1044e(b)(6) (emphasis added).

We conclude, first, that the second NCIS interview was a *proceeding* within the meaning of the statute. A "proceeding" is an "act or step that is part of a larger action." *Proceeding, Black's Law Dictionary* (11th ed. 2019). Interviewing Appellee about the veracity of her report of a sexual offense is an act that is part of the larger action of investigating the alleged sexual offense itself, even if NCIS no longer believed the complaining witness was a victim. Therefore, neither NCIS's belief nor its titling

decision could terminate the attorney-client relationship.[5] Appellee was still represented by VLC at the time of the second interview.[6] We decline to read into the statute a limitation on the kind of proceeding in which a victim has a right to VLC where Congress mandated VLC be made available to a victim at *any* proceeding in connection with the investigatory and legal processes arising from a sex-related offense.

We further conclude the second NCIS interview was a proceeding *in connection with* the reporting, investigation, and prosecution of a sex-related offense. After investigating Appellee's allegation that PFC Hotel had sexually abused and sexually harassed her, NCIS reinterviewed Appellee on suspicion she had been untruthful. Appellee was subsequently charged with making a false official statement in the first NCIS interview. It is hard to imagine a proceeding more closely connected with the reporting, investigation, and prosecution of the alleged sex-related offenses than a second interview to determine whether the allegations made in the first interview were true, especially where the second interview arose in the course of the initial investigation, involved all the parties from the original investigation, and directly concerned the allegations Appellee made in the first interview. As the CCA noted, "[e]ach and every statement . . . that the Government

---

[5] We concur with the CCA's assertion that "the NCIS 'policy' of determining when an alleged victim is no longer entitled to VLC representation has no foundation in law and is contrary to the letter and intent of Section 1044e and the various instructions that flow therefrom." *Deremer*, 85 M.J. at 552.

[6] Although the Government contends the investigation into Appellee's sexual abuse and sexual harassment allegations had been closed, the parties stipulated at trial that the VLC's representation of Appellee terminated "as of July 2022," approximately four months after the second NCIS interview. Additionally, the Government conceded before the CCA that Appellee was still represented by VLC at the time of the second NCIS interview. *Deremer*, 85 M.J. at 552.

identified as a false official statement originated with and was uttered during Appellant's initial interview. It is impossible, as a matter of common sense, to disentangle the allegation of sexual assault from the statements made during the announcement of that allegation." *Deremer*, 85 M.J. at 552.

Appellee was entitled to VLC during the second interview for an additional reason: she was subject to potential criminal liability for making a false official statement as a result of her report of sex-related offenses. Congress specifically contemplated the possibility that a victim could face criminal liability as a result of reporting a sex-related offense, authorizing "[l]egal consultation *regarding potential criminal liability of the victim stemming from or in relation to the circumstances* surrounding the alleged sex-related offense *and the victim's right to seek military defense services.*" § 1044e(b)(1) (emphasis added). Thus, although NCIS viewed Appellee as a suspect, she was still represented by VLC and she was entitled to consult with her VLC about both her potential liability for making the report and her right to seek military defense counsel.

Moreover, the statute allows for "legal consultation and assistance . . . in any proceedings of the military justice process in which a victim can participate as a witness or *other party.*" 10 U.S.C. § 1044e(b)(8)(B) (emphasis added). In this case, Appellee was the *other party* in a proceeding of the military justice process when she was subject to questioning.[7] We do not suggest that this statutory provision creates a boundless right to VLC in every proceeding in which a victim participates. We note only that as a qualifying victim represented by VLC, Appellee was entitled to VLC at a proceeding *arising from* her report

---

[7] We do not interpret the statutory language "other party" to confer "party" status (i.e., that of the government or the accused) upon an alleged victim. We merely conclude that this statutory language entitled Appellee to be eligible for "[l]egal consultation and assistance" during her second interview with NCIS.

of sex-related offenses where she was the "other party" *because* of her report of sex-related offenses. The second NCIS interview clearly falls within that scope. Therefore, the lower court did not err in holding that Appellee had a right to VLC during the second NCIS interview.

Finally, we reject the Government's argument that Appellee knowingly and voluntarily waived her statutory right to VLC by waiving her Fifth Amendment right to counsel. After informing Appellee she was suspected of the offense of making a false official statement in violation of Article 107, UCMJ,[8] NCIS advised Appellee of her rights as a suspect in accordance with Article 31(b), UCMJ, and M.R.E. 305, including her Fifth Amendment rights to consult with a lawyer prior to questioning and to have that lawyer present during the interview. Appellee indicated her understanding of these rights and agreed to proceed with the interview without defense counsel.

Even assuming that Appellee waived her Fifth Amendment right to counsel, her waiver of defense counsel did not necessarily waive the entirely distinct § 1044e right to VLC, a right the military judge did not address.[9] *See Deremer*, 85 M.J. at 554 ("Section 1044e provides different rights to an alleged victim, and the talismanic recitation of Article 31(b) and/or Mil. R. Evid. 305 is not sufficient in these cases."). The Fifth Amendment right to defense counsel and the § 1044e right to VLC are separate rights, originating in distinct sources of law, triggered by different events, and applicable under different circumstances. In *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), the Supreme Court held that under the Fifth Amendment, law enforcement must advise a person of their right to counsel

---

[8] Appellee was not advised that she was suspected of the offense of malingering.

[9] As noted above, *supra* p. 7, the military judge ruled that Appellee voluntarily waived her Article 31(b) rights but did not address whether the waiver was knowing and intelligent and did not address the impact of the VLC's absence on the waiver analysis.

before conducting a custodial interrogation, and if they invoke that right, questioning must cease. By contrast, § 1044e provides that a qualifying victim shall be offered VLC upon making a restricted or unrestricted report of a sex-related offense, and notice of the availability of VLC "shall be provided to [a qualifying victim] before any military criminal investigator or trial counsel interviews, or requests any statement from, the individual regarding the alleged sex-related offense." § 1044e(a)(1), (f)(2). Notwithstanding this mandatory language, Appellee was not advised of her right to VLC in the second NCIS interview; she was not asked whether she understood that right; and she was not asked and did not state whether she desired to proceed without her VLC. Therefore, we conclude Appellee did not waive her right to VLC during the second NCIS interview.

### B. Appellee did not have a due process right to VLC

The second certified question requires us to determine whether the violation of Appellee's statutory right to VLC constituted a due process violation. Reviewing this question of law de novo, *United States v. Paul*, 73 M.J. 274, 277 (C.A.A.F. 2014) (citing *United States v. Springer*, 58 M.J. 164, 167 (C.A.A.F. 2003)), we conclude there was no violation of due process because there is no evidence Appellee reasonably relied on her right to VLC.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A statement obtained in violation of the Due Process Clause is "involuntary" and inadmissible at trial, subject to specific exceptions not at issue here. M.R.E. 304(a)(1)(A).

The Supreme Court has "repeatedly held that . . . statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause" even if there was "no constitutional or inherent right" independent of the statute. *Vitek v. Jones*, 445 U.S. 480, 488 (1980) (internal quotation marks omitted) (citation

omitted). When deciding whether a statutory right implicates due process, the Supreme Court considers whether "an individual has reasonably relied" on the statutory right for their benefit and whether they "suffered substantially" because of its violation. *United States v. Caceres*, 440 U.S. 741, 752-53 (1979) (noting that "the Due Process Clause is implicated [when] an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by an agency"); *see also Raley v. Ohio*, 360 U.S. 423, 425 (1959) (holding that the Due Process Clause prevented the conviction of individuals who relied upon assurances from a state investigating commission that they had a privilege under state law to refuse to answer questions); *Cox v. Louisiana,* 379 U.S. 559, 571 (1965) (holding that it violated due process for an individual to be convicted for demonstrating "near" a courthouse where a police official had informed the demonstrators that they could assemble in that location without violating a state statute prohibiting demonstrations "near" a courthouse).

Before this Court and the CCA, Appellee argued that she reasonably relied on the statutory right to VLC because SA MP assured her, after the first interview, that he would go through her VLC if he needed to speak with her again. However, she did not argue this in the motion to suppress. Moreover, there is no evidence in the record that Appellee relied on her statutory right to VLC. Reviewing the record, we note that at no point during the second interview did Appellee ask to contact her VLC, request his presence, or otherwise say anything to suggest she wanted or needed his assistance. Because Appellee has not shown that she relied on her right to VLC during the second NCIS interview, we conclude that the violation of § 1044e did not rise to a due process violation. *See United States v. Teers*, 591 F. App'x 824, 840 (11th Cir. 2014) (unpublished) (noting that the appellant did not show due process was implicated by the failure of law enforcement officers to advise him of "*Miranda*-like warnings" during a

noncustodial interview where the appellant "[did] not allege, much less show, that . . . '[he] reasonably relied on agency regulations promulgated for his guidance or benefit and . . . suffered substantially because of their violation by the agency' " (fourth alteration in original) (quoting *Caceres*, 440 U.S. at 752-53)). Having concluded that Appellee did not reasonably rely on her right to VLC, there is no need to discuss the second prong of the test, i.e., whether she was substantially harmed by the violation of that right.

Without applying the two-part test set forth above to determine whether the statutory right implicated due process, the CCA reached a contrary conclusion, holding that 10 U.S.C. § 1044e confers a due process right to counsel. *Deremer*, 85 M.J. at 554-55 ("Section 1044e . . . amounts to an articulation of what process is due, consistent with the Fifth Amendment, to victims of alleged sexual assault in the military."). To reach this conclusion, the CCA relied on *United States v. McOmber*, where this Court's predecessor held:

> [O]nce an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code. This includes questioning with regard to the accused's future desires with respect to counsel as well as his right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given his client.

1 M.J. 380, 383 (C.M.A. 1976) (citing Article 27, UCMJ, 10 U.S.C. § 827). The *McOmber* rule was codified in M.R.E. 305(e). *See Manual for Courts-Martial, United States*, Analysis of the Military Rules of Evidence app. 22 at A22-15 (1994 ed.).

*McOmber* ensured that the statutory right to counsel aligned with "then-current Supreme Court constitutional

precedent regarding the right to counsel." *United States v. Finch*, 64 M.J. 118, 124 (C.A.A.F. 2006). However, that precedent was abrogated by the Supreme Court's decisions in *Minnick v. Mississippi* and *McNeil v. Wisconsin*, which redefined the right to counsel during custodial interrogation under the Fifth and Sixth Amendments.[10] Consequently, the *McOmber* rule was removed from M.R.E. 305(e) in order to conform the Military Rules of Evidence to *Minnick* and *McNeil. Finch*, 64 M.J. at 124. In response, this Court formally overruled *McOmber* in *Finch* when it held that a military investigator's failure to notify counsel before interrogating the accused, even when the investigator knew of counsel's representation of the accused, did not render statements involuntary. *Id.* at 124-25. We noted that "[t]he *McOmber* notification rule and the subsequent codification of the rule in the Military Rules of Evidence were not constitutionally required under the Fifth or Sixth Amendments of the Constitution and are not consistent with the law set forth in *Minnick* and *McNeil*."[11] *Id.* at 125. We decline to resurrect *McOmber* to create a due process right to VLC, especially in the absence of any evidence Appellee relied on her statutory right to VLC.

## C. Suppression is not an appropriate remedy

While § 1044e created a right to VLC in this case, it did not provide a remedy for violation of that right. Acknowledging the absence of a statutory remedy, the CCA nevertheless found the military judge abused his discretion in denying the motion to suppress. *Deremer,* 85 M.J. at 554.

---

[10] The Supreme Court in *Minnick* held that once a suspect has requested counsel, interrogators may not reinitiate questioning unless an attorney is present. 498 U.S. 146, 153 (1990). The Court in *McNeil* noted that the Sixth Amendment right to counsel attaches "at the first formal proceeding against an accused." 501 U.S. 171, 180-81 (1991).

[11] Appellee was not entitled to counsel under the Sixth Amendment because charges were not yet preferred against her. M.R.E. 305(c)(3).

According to the CCA, NCIS violated due process by questioning Appellee without giving her VLC the opportunity to be present, rendering Appellee's subsequent statements involuntary and therefore inadmissible under M.R.E. 304.[12] *Id.* at 553-54 ("Section 1044e . . . amounts to an articulation of what process is due, consistent with the Fifth Amendment, to victims of alleged sexual assault in the military.").

We will not read into the statute a remedy of suppression for a statutory violation that, as discussed above, did not implicate due process. "The few cases in which [the Supreme Court has] suppressed evidence for statutory violations . . . . arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006). For example, in *McNabb v. United States*, statements made by a defendant during a prolonged detention in violation of a statute requiring persons arrested without a warrant to be promptly brought before a judge implicated the same Fifth Amendment considerations that arose in *Miranda*. 318 U.S. 332, 338-39 (1943). In *Miller v. United States*, a seizure of evidence effectuated by breaking the door of the defendant's home in violation of a statute requiring officers to first give notice and be denied admittance implicated the same protections as the Fourth Amendment. 357 U.S. 301, 305 (1958). In both cases, the Court held that suppression was appropriate even though the statutes at issue did not

---

[12] M.R.E. 304(a) provides that upon timely motion of the accused, an involuntary statement from the accused is inadmissible at trial. "Involuntary statement" is defined as "a statement obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." M.R.E. 304(a)(1).

specify a remedy. *McNabb*, 318 U.S. at 341; *Miller*, 357 U.S. at 313-14.

Unlike the statutes at issue in *McNabb* and *Miller*, § 1044e does not protect a constitutional interest. Undoubtedly, it creates a right that is *reminiscent* of an accused's rights to counsel under the Fifth and Sixth Amendments. But neither the Fifth Amendment nor the Sixth Amendment confers upon a *victim* a right to counsel.

In the absence of a due process violation or other constitutional implications, we decline to imply a remedy of suppression for violation of a statute that does not itself authorize a remedy. *See, e.g.*, *M.W. v. United States*, 83 M.J. 361, 362, 365 (C.A.A.F. 2023) (holding, based "solely on the statutory language," that this Court lacked jurisdiction to review a decision of the lower court at the victim's request where Article 6b, UCMJ, 10 U.S.C. § 806b (2018), grants various rights to victims of an offense but "contains no language that expressly or implicitly grants this Court jurisdiction to review any class of cases"). Canons of statutory interpretation instruct that a matter not covered is to be treated as not covered. *See* Scalia & Garner, *supra* p. 10, at 93. Nowhere in the statute itself or in the M.R.E. do we find an authorized remedy of suppression for violations of § 1044e.

Congress could amend § 1044e to authorize any appropriate remedy including suppression. Similarly, the President could amend the definition of "involuntary statement" under M.R.E. 304(a) to include violations of § 1044e, much as it includes violations of Article 31, UCMJ, within that definition. However, in the absence of clear statutory or regulatory authority, this Court declines to create such a remedy.

### IV. Conclusion

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is set aside. The record is returned to the Judge Advocate General of the Navy for a new Article 66, UCMJ, 10 U.S.C. § 866 (2024), review consistent with this opinion.

Judge SPARKS, with whom Judge MAGGS joins, concurring in the judgment.

I write separately because, though I agree with the majority that the decision of the United States Navy-Marine Corps Court of Criminal Appeals should be set aside, I reach this conclusion via a simpler route. Unlike the majority, I believe that, when Appellee was informed of and signed a rights advisement and then waived her right to consult a lawyer or have one present, she waived her right to any counsel, including her assigned victim's legal counsel (VLC).

The right to counsel is a powerful but waivable right. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). To find this holds true for a suspect but not a victim would be to grant victims a right to counsel that transcends those accorded to an accused through the Fifth and Sixth Amendments of the Constitution. I cannot believe that this was Congress's intent in crafting 10 U.S.C. § 1044e and therefore conclude that Appellee's right to consult her VLC or have him present was a right she could waive.

> [W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

*Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (internal quotation marks omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "[W]aiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins,* 560 U.S. 370, 382 (2010) (internal quotation marks omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). It also must be "made with a full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." *Id.* at 382-83 (internal quotation marks omitted) (quoting *Moran*, 475 U.S. at 421).

*United States v. Deremer*, No. 25-0158/MC
Judge SPARKS, with whom Judge MAGGS joins,
concurring in the judgment

Voluntariness depends upon "whether an accused's will has been overborne." *United States v. Lewis,* 78 M.J. 447, 453 (C.A.A.F. 2019) (internal quotation marks omitted) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). To determine voluntariness, a court evaluates "both the characteristics of the accused and the details of the interrogation." *United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006) (internal quotation marks omitted) (quoting *Schneckloth*, 412 U.S. at 226). Factors within these categories include: (1) an appellant's youth; (2) lack of education or low intelligence; (3) advice to the appellant of his constitutional rights; (4) length of detention; (5) repeated and prolonged nature of questioning; (6) use of physical punishment such as deprivation of food or sleep; and (7) amount of time between interrogations. *Id.*

Here, the military judge considered the above factors and properly found that "the conditions of the rights advisement . . . were not coercive in any way." The interview was brief and not contentious and there was no indication Appellee was overwhelmed by or did not understand her rights.

In addition, nothing indicates Appellee's wavier of her rights was not knowing and intelligent. Appellee initialed and signed a rights advisement form that confirmed she had been notified that:

> "I have the right to consult with a lawyer prior to any questioning. This lawyer may be a civilian lawyer retained by me at no cost to the United States, a military lawyer appointed to act as my counsel at no cost to me, or both[,]"

and

> "I have the right to have my retained lawyer and/or military lawyer present during this interview."

She verbally informed law enforcement that she understood her rights and that she did not wish to consult with a lawyer or have one present during their interview. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a

*United States v. Deremer*, No. 25-0158/MC
Judge SPARKS, with whom Judge MAGGS joins,
concurring in the judgment

waiver of the Fifth Amendment privilege." *United States v. Mott*, 72 M.J. 319, 330 (C.A.A.F. 2013) (alteration in original removed) (internal quotation marks omitted) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). Instead, the focus rests on whether the accused "fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *Id.* (alteration in original removed) (internal quotation marks omitted) (quoting *United States v. Ruiz*, 536 U.S. 622, 629-30 (2002)). Under the circumstances, the rights advisement Appellee received did not distinguish between a VLC and defense counsel. Appellee had met with her VLC previously and was aware he had been appointed to represent her. In fact, the VLC was the only attorney she had contact with up to that point in the investigation. In waiving her right to "a lawyer," she waived the presence of any assigned or retained counsel, including her VLC.

Servicemembers, like their civilian counterparts, possess a constitutionally guaranteed but waivable right to counsel. They "[do not] enjoy due process protections above and beyond the panoply of rights provided to them by the plain text of the Constitution, the UCMJ, and the *MCM*." *United States v. Flanner*, 85 M.J. 163, 176 (C.A.A.F. 2024) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Vasquez*, 72 M.J. 13, 19 (C.A.A.F 2013)). Even if we assume without deciding that Appellee had a right to have her VLC present under 10 U.S.C. § 1044e, Appellee was clearly informed of her right to counsel and just as clearly chose to waive her rights and speak to law enforcement without any counsel present.